Clara A. SHEERAN, Plaintiff,

v.

Caspar WEINBERGER, Defendant.

Civ. A. No. 8995.

United States District Court,
S. D. Ohio, W. D.

Feb. 5, 1975.

Thomas F. Phalen, Jr., Cincinnati, Ohio, for plaintiff.

Byron E. Trapp, Asst. U. S. Atty., Cincinnati, Ohio, for defendant.

## ORDER OF REMAND

HOGAN, District Judge.

This suit is brought pursuant to 42 U.S.C. §§ 405(g) and 1395ff for judicial review of a final decision of the Secretary of Health, Education, and Welfare, denying Medicare benefits to plaintiff Clara A. Sheeran for services rendered to Mrs. Sheeran at Christ Hospital in Cincinnati from May 13, 1970 to June 14, 1970. The matter is now before the Court on defendant Secretary's motion for summary judgment.

Plaintiff was an inpatient at Christ Hospital from April 29, 1970 to June 14, 1970 for treatment of fractures of both wrists, hypertension, and complications of multiple minor cerebral vascular thrombosis. Her attending physician, Dr. Paul Schuster, also sought to determine the cause of her fall on April 28, 1970, which resulted in the wrist fractures. Initially, defendant denied any Medicare benefits for this admission. (Tr. 463.) Upon reconsideration, benefits were granted for the period of April

29, 1970 to May 3, 1970. At plaintiff's request a hearing was then held before an Administrative Law Judge (ALJ). On January 22, 1973 the ALJ issued an opinion which extended the Medicare benefits to cover the period of April 29, 1970 to May 12, 1970; however, benefits were denied for the period of May 13, 1970 to June 14, 1970. This decision was subsequently approved by the Appeals Council, thereby making it the final decision of the Secretary.

On the evening of April 29, 1970 plaintiff, who was then 71 years old, fell in her home, breaking both wrists and bruising her face, forehead, and scalp. She was taken to Christ Hospital and treated by Dr. Robert S. Heidt. Dr. Heidt set the wrists in casts, which extended from the mid-palm to the elbows. Plaintiff returned to her son's home at about 2 A.M. on April 29, 1970.

That same day plaintiff's son, Thomas Sheeran, called Dr. Paul Schuster, her regular physician, requesting that he examine plaintiff. Mr. Sheeran was concerned because his mother was pale and complaining of pain. She required assistance to move about and could not stand for any length of time. Even prior to the accident, she lacked the strength or equilibrium to walk normally, due to her obesity and arthritis.

Examining plaintiff at her son's home, Dr. Schuster observed that she was in shock, apprehensive, unable to care for herself, had elevated blood pressure, and showed signs of early decompensation. Prior to the accident, Dr. Schuster had been treating plaintiff for hypertension, cardiac decompensation, obesity, osteoarthritis, and osteoporosis. Because plaintiff had fallen due to dizziness, Dr. Schuster concluded that hospitalization was necessary to determine the precise cause of her fall. Further, he considered hospitalization necessary to treat her fractures, hypertension, cardiac decompensation, and to determine the extent of her other injuries. Accordingly, on April 29, 1970 plaintiff was admitted to Christ Hospital.

Dr. Schuster's physical examination of plaintiff following her admission disclosed no head injuries besides the bruises to the face, forehead and scalp. Examination of the chest showed a barrel deformity, large negative breasts, flat diaphragm, and large lung fields. The heart was enlarged to the left and had regular sinus rhythm tones of fair quality. Her blood pressure was 190/100. There was some edema and varicosities of the legs. Examination of the joints revealed osteoporosis and arthritis. Dr. Schuster's positive findings were: fractured wrists, hypertension, osteoarthritis, and obesity. (Tr. 496)

X-rays were taken on April 30, 1970 by Dr. Chapin Hawley. X-rays of the skull showed no fractures. Chest and rib X-rays revealed that the heart was in the upper limits of normal range, though perhaps somewhat enlarged. Lungs were clear, except for a minimal amount of density in the left costophrenic angle area. Further, Dr. Hawley noted: "There is a question of injury to several of the mid-level ribs on the left in the anterior auxiliary line. Ribs on the right appear to be intact. When patient is able further rib films are suggested with emphasis on the areas of maximum tenderness." (Tr. 497). A significant amount of degenerative change was also noted in the spine. Finally, a third set of X-rays, taken of the knees, revealed no fractures, but did show demineralization of bone and degenerative change with spurring.

During the course of plaintiff's hospitalization, Dr. Schuster prescribed oral medication, intramuscular injections of Mercuhydrin (which were administered four times), catheterization, and elevation of the right hand. The catheter was inserted on April 29, 1970 and removed on May 27, 1970. It was irrigated almost daily. At the hearing before the ALJ, Dr. Schuster said the catheter was necessary since plaintiff was non-ambulatory and unable to take care of herself. Further, he sought to prevent any complications arising because of incontinence. (Tr. 294). Regarding her

daily oral medication, Dr. Schuster said she was given Placidyl for sleep, Darvon for pain, and Diuril for hypertension. The intramuscular injections of Mercuhydrin were for congestive heart failure. (Tr. 305, 367–68)

In addition to the X-rays, other laboratory tests, including blood tests and an electrocardiogram, were performed. The results of these tests were normal. On about May 21, 1970 plaintiff was ambulated for the first time since her admission. (Tr. 450) The catheter was removed on May 27, 1970. Her casts were removed on June 12, 1970 and two days later she was discharged to a skilled nursing facility.[1]

In the 46 days Mrs. Sheeran spent at Christ Hospital, Dr. Schuster visited her 34 times. On these visits, Dr. Schuster would check her blood pressure and record it, if it had significantly changed. Because she was nonambulatory for most of her stay, and therefore subject to developing complications, Dr. Schuster visited her almost daily for observation purposes. Additionally, Dr. Heidt, the physician who set the wrists, visited plaintiff 13 times during her stay.

At the hearing, Dr. Schuster testified that plaintiff's blood pressure was unstable. He said the cystolic pressure vacillated between 160 and 190, and as low as 140, and the diastolic reached 100 to 105. For Mrs. Sheeran, these readings were high, according to Dr. Schuster, since prior to the accident she had much lower blood pressure readings. (Tr. 303, –04) (It should also be noted that Dr. Schuster treated plaintiff intermittently for twelve years prior to the accident.) He further stated that the unstable blood pressure was one reason for her extended confinement. Dr. Schuster's own records show readings of 190/100 upon admission, 180/100 on April 30, 180/90 on May 1, 170/90 on May 10, 170/70 May 19, 150/80–85 on May 21, 160/90 on May 24, 170/85 on May 31, 170/85–90 on June 7. (Tr. 495, 513–14)

Dr. Schuster and Thomas Sheeran both testified that, during plaintiff's hospital stay, she complained of pains in left side of her chest. Dr. Schuster said he acknowledged the possibility of broken ribs following the radiology report of April 30, 1970. Until she could be moved, however, he contemplated no further films of the ribs. He did not actively treat the rib injury at that time because—

"The skin would not take taping or any type of support, and, besides, splinting the chest would add to further complications leading possibly to pneumonia or further cardiac decompensation." (Tr. 298)

He added that this rib injury enhanced her hospital stay.

Another chest X-ray was taken on June 8, 1970, which reavealed: "Pleural reaction from old rib fractures . . . on the left." (Tr. 500) Dr. Schuster explained that "old rib fractures" could mean anywhere between two weeks to three years. In the twelve years he had treated plaintiff, Dr. Schuster knew of no rib fracture prior to the fall. He therefore concluded that Mrs. Sheeran's fall on April 28, 1970 had "definitely" fractured her ribs on the left side. (Tr. 299) Additionally, Thomas Sheeran said that, prior to the accident, he knew of no rib injury to his mother. (Tr. 379)

Plaintiff has also submitted a letter from Dr. Chapin Hawley, Director of the Radiology Department at Christ Hospital, which states that the finding of "old rib fractures" on the June 8, 1970 report is "consistent with an acute rib injury on April 28, 1970." Plaintiff had presumably included this letter as an attachment to her brief before the Appeals Council. The transcript from the Secretary notes, however, that the attachment was missing from the brief.

[1]. It appears to this Court that the treatment and care plaintiff received to May 13, 1970 was substantially the same as the treatment and care she received thereafter until her discharge on June 14, 1970.

Nevertheless, the letter's contents were at least summarized in the brief.

Dr. J. Robert Newstedt, Chairman of the Utilization Review Committee at Christ Hospital during 1969 and 1970, also testified at the hearing. The hospital's Utilization Review Committee had certified the need for plaintiff's continued hospitalization on May 10, 1970 and recertified such a need on May 17 and June 14, 1970. (Tr. 545–46). Dr. Newstedt said he thought a minimum of two to four weeks' hospitalization was required in plaintiff's case. (Tr. 342)

Another witness at the hearing was Dr. Benjamin Schuster, a specialist in internal medicine and cardiovascular disease. Dr. Schuster testified in the role of a medical adviser. He examined and explained the medical records, offering his opinion regarding plaintiff's condition without ever having examined her. Dr. Schuster opined that plaintiff's blood pressure was not inordinately elevated after her admission and that the readings were normal for her age. He conceded that hospitalization was required to determine the reason for her fall, but after two weeks, in Dr. Schuster's opinion, skilled nursing services were no longer needed. Further, he said that the electrocardiogram and chest X-rays disclosed no significant evidence of congestive heart failure. Dr. Schuster inferred that treatment for congestive heart failure was not a primary reason for hospitalization, since the only treatment plaintiff received was injections of Mercuhydrin. A more direct treatment for congestive heart failure, according to Dr. Schuster, would have been to digitalize the patient and put her on a low sodium diet, neither of which was done in this case.

Relying heavily on the testimony of the medical adviser, the ALJ determined that plaintiff was entitled to another nine days of coverage in addition to the five days already granted. After two weeks of hospitalization, the ALJ found the care was custodial, and therefore excluded from coverage under 42 U.S.C. § 1395y(a)(9).[2] Further, he found that "the weight of the evidence fails to support a conclusion that the claimant sustained one or more fractured ribs in her fall of April 28, 1970." (Tr. 149) Additionally, he concluded that plaintiff did not receive any skilled medical or nursing services for the fractured ribs during the period of hospitalization.

In support of his finding regarding the question of fractured ribs, the ALJ noted that Dr. Heidt, the orthopedist who set plaintiff's wrists, made no reference to a rib injury in his diagnosis. Nor did the Utilization Review Committee, as pointed out by the ALJ, mention rib fractures as a reason for their certification of plaintiff's extended hospitalization. Other evidence marshaled by the ALJ in support of his finding included these facts: (1) Although Dr. Paul Schuster ordered X-rays of the chest on April 30, 1970 for possible fractures, he did not give any directions for care of possible rib fractures; (2) although the progress notes mention soreness in the rib cage, no reference is made to rib fractures; (3) Dr. Schuster's physical examination of plaintiff does not mention rib fractures; (4) although X-rays of the wrists were taken on May 20, 1970, and X-rays of the pelvis, right knee and left knee on May 23, 1970, no further X-rays of the chest were taken until June 8, 1970; and (5) the discharge summary, prepared by Dr. Paul Schuster, fails to mention any fractured ribs. The ALJ therefore concluded:

"The omission of any mention of fractured ribs in the discharge summary

2. Throughout the entire administrative proceeding, defendant has focused on whether plaintiff required and received "skilled nursing services on a continuing basis." Benefits were initially denied by defendant on this point (Tr. 463) and the ALJ also focused on this question, with particular emphasis on whether the nursing services were required on a "continuing basis." (Tr. 136–37) To forego a lengthy discussion of all the statutes and regulations pertinent to plaintiff's Medicare claim, we accept as correct defendant's framing of the questions presented.

is a clear indication that Dr. Paul Schuster was not concerned with any such condition at that time, and that therefore any fractured rib condition was not subject of treatment or skilled care during the claimant's period of hospitalization." (Tr. 139)

The question presented here is whether there is substantial evidence to support the final decision of the Secretary that payment may not be made to plaintiff for expenses incurred for the inpatient hospital services rendered to her from May 13, 1970 to June 14, 1970 at Christ Hospital, because such services were "custodial" and therefore excluded from coverage.

Section 1862(a) of the Social Security Act, 42 U.S.C. § 1395y(a), provides in pertinent part:

"Notwithstanding any other provision of this title, no payment may be made under part A or part B for any expenses incurred for items or services

\* \* \* \* \* \*

"(9) where such expenses are for custodial care."

The phrase "custodial care" is not defined in the Social Security Act. The regulations which have been promulgated, however, provide some guidance. 20 C.F.R. § 405.310 provides in relevant part:

"Notwithstanding any other provisions of this Part 405, no payment may be made for any expenses incurred for the following items or services:

\* \* \* \* \* \*

"(g) Custodial care (in the case of extended care services, any care which does not meet the definition of extended care in §§ 405.126–405.128)."

Section 405.126 defines post-hospital care as:

" . . . that level of care provided after a period of intensive hospital care to a patient who continues to require *skilled nursing services* (as defined in § 405.127) on a *continuing basis* (see § 405.128) but who no long-

er requires the constant availability of medical services provided by a hospital." (Emphasis added.)

In defining the phrase "skilled nursing services," 20 C.F.R. § 405.128(b) specifically includes:

"(1) Intravenous or intramuscular injections and intravenous feeding;

\* \* \* \* \* \*

"(4) Insertion or replacement of catheters . . ."

Specifically excluded from the term "skilled nursing services" are:

"(1) Administration of routine oral medications . . . ;

\* \* \* \* \* \*

"(3) Routine services in connection with indwelling bladder catheters;

\* \* \* \* \* \*

"(5) Prophylactic and palliative skin care . . . ;

\* \* \* \* \* \*

"(7) General maintenance care in connection with a plaster cast;

\* \* \* \* \* \*

"(12) Assistance in dressing, eating, and going to the toilet." 20 C.F.R. § 405.127(d).

Section 405.128 of the regulations defines "continuing basis" as follows:

"Skilled nursing services are required on a continuing basis (see § 405.126) when the continuing availability of skilled nursing personnel is warranted. In determining whether the continuing availability of skilled nursing personnel is warranted, the following principles apply:

"(a) Frequency of services. The frequency of skilled nursing services required, rather than their regularity, is the controlling factor in determining whether the continuing availability of skilled nursing personnel is warranted. For example, a patient may require intramuscular injections on a regular basis every second day. If this is the only skilled service required, it would not necessitate the continuing availability of skilled nurses.

"(b) Observation. Observation may be the principal continuous service when the unstabilized condition of the patient requires the skills of a licensed nurse to detect and evaluate the patient's need for possible modification of treatment or institution of medical procedures. For example, pending stabilization of the condition, a patient suffering from arteriosclerotic heart disease may require continuous close observation by skilled nurses for signs of decompensation and loss of fluid balance in order to determine whether the digitalis dosage should be changed or other therapeutic measures should be taken . . . . "

In determining that the services plaintiff received after her first fourteen days of hospitalization were "custodial," the ALJ concluded, in part, that such services were not required on a "continuing basis." In support of this determination, the ALJ relied on, inter alia, the testimony of Dr. Robert Newstedt, chairman of the Utilization Review Committee. The ALJ cited Dr. Newstedt's opinion that, under the language of the federal regulations, plaintiff did not require skilled nursing services on a continuing basis during the period of May 4, 1970 to June 14, 1970.

Examination of Dr. Newstedt's testimony reveals his interpretation of the term "continuing basis:"

"Specifically, I interpret it to mean that skilled nursing services were needed 24 hours a day, but maybe that is not what it means." (Tr. 345)

Under this view of the term, Dr. Newstedt stated:

" . . . there would be practically no one who could get coverage in the hospitals from Blue Cross through Medicare. If a man comes in 85 and has a hernia repaired, you know he doesn't need nursing care 24 hours a day. He needs it when he needs it, but he doesn't need it 24 hours a day, but you can't divorce the two, I think." (Tr. 344)

In response to questions by plaintiff's counsel, regarding what services plaintiff needed and received, Dr. Newstedt said:

"Well, I think what we are talking about here is a patient who is in the stroke age, has had the possibility of cerebrovascular hardening of the arteries; and the possibility of hemorrhage, the possibility of what we call thrombosis. This would be a clot in the vessel, hemorrhage from the vessel. Both can cause pressure on the brain or serious damages. She had vertigo and she did fall suffering the injury, and we should be sure that she is not going to have more trouble like this. In order to determine some of the possibilities of nervous system disease it requires time." (Tr. 346–47)

Further, Dr. Newstedt stressed the importance of observation of plaintiff, in order to prevent development of any complications:

"In her case, we thought this required at least a period of 2 to 4 weeks observation to be sure that she was safe to go back. This did not reflect the treatment of fractures particularly, but we thought she was in need of observation to be sure that this was not a recurring difficulty or that she would get more trouble, more serious neurological involvement." (Tr. 342)

As quoted previously, the regulations contemplate that observation alone may require skilled nursing services on a continuing basis. Moreover, the term "continuing basis" is equivalent to "continuing availability." Clearly, the regulations do not contemplate nursing services which are rendered 24 hours a day. On the contrary, this Court finds that Dr. Newstedt's description of the type of nursing services required by plaintiff (particularly observation) fits squarely within the language "when the continuing availability of skilled personnel is warranted." Moreover, it should be emphasized that social security legislation is remedial and has therefore been liberally construed to effectuate its stated purpose. See Walston v. Gardner, 381

F.2d 580 (6th Cir. 1967); Pippin v. Richardson, 349 F.Supp. 1365, 1369 (M.D.Fla.1972).

■ In finding that the care plaintiff received was custodial, the ALJ also concluded that the services rendered were not primarily skilled nursing services. After reviewing the record, this Court holds that this finding is not supported by substantial evidence. First, there was the catheter treatment, which included almost daily irrigation. Dr. Paul Schuster stated that irrigation of a catheter is clearly not a routine service, but one which requires certain technical skills. (Tr. 372–73) See also Hayner v. Weinberger, 382 F.Supp. 762, 766 (E.D.N.Y.1974); Lord v. Richardson, 356 F.Supp. 232, 234 (S.D.Ind.1972). Second, intramuscular injections were administered on four occasions. Although such skilled nursing services were not provided on a "continuing basis," the injections should be considered cumulatively with the other services rendered. Third, throughout her hospital stay, plaintiff was visited almost daily by her attending physician, Dr. Paul Schuster, for observation purposes and to check her blood pressure. Dr. Schuster indicated that he observed her particularly for signs of cardiac decompensation and pneumonia, both of which were possible complications since plaintiff was nonambulatory. (Tr. 369–70) Moreover, Dr. Schuster's testimony that plaintiff's blood pressure was unstable *for her* should be entitled to greater weight than that of the medical adviser who, unlike Dr. Schuster, never treated or even examined plaintiff. Finally, as indicated by Dr. Newstedt, continuous observation of plaintiff by skilled medical personnel was also necessary to determine the possibilities of nervous system disease, which may have caused her to fall.

■ The Court further concludes that the ALJ's finding that plaintiff suffered no rib fractures from the fall on April 28, 1970 is not supported by substantial evidence. The evidence is uncontradicted that plaintiff complained of pain in the left rib cage area. Both Dr. Paul Schuster and plaintiff's son so testified. Dr. Schuster's progress notes also corroborate this point. The X-rays which were taken on April 30, 1970 and June 8, 1970 are strongly supportive of a finding that plaintiff's fall caused some rib injury. Dr. Hawley's letter, which was summarized in plaintiff's brief before the Appeals Council, indicates that the findings of the June 8, 1970 X-ray report are consistent with a rib injury sustained on April 28, 1970. Under the facts presented here—a fall by an elderly woman which fractured both wrists and bruised her face, forehead, and scalp, her complaints of soreness in the left rib cage area, and the clinical findings indicating rib injury—it seems highly probable that plaintiff's fall fractured or otherwise injured her ribs.

In addition to and in support of his finding that plaintiff suffered no rib injury, the ALJ also concluded that any alleged rib injury received no treatment or played any significant part in plaintiff's hospitalization. The ALJ appears to have disregarded Dr. Schuster's plausible explanation of why he did not actively treat plaintiff's rib injury—he was unable to do so, due to her nonambulatory condition and skin problems, and for fear of causing further complications. (Tr. 297–98) In other words, Dr. Schuster's "non-treatment" of the rib injury was, in his opinion, the correct treatment under the circumstances. Dr. Schuster further indicated that the rib injury prolonged her hospital stay since it was one cause of plaintiff's extended nonambulation.

■ In summary, the record indicates that plaintiff is an elderly woman, who suffered from obesity, two broken wrists, a rib injury, other contusions, osteoporosis, osteoarthritis, arthritis, cardiac decompensation, hypertension, a skin condition (psoriasis) and was nonambulatory for most of her hospital con-

finement. Her treating physician decided that she required hospitalization for a period of time to determine the cause of her dizziness and fall, and to prevent further complications. Dr. Newstedt, Chairman of the Utilization Review Committee, concurred in this opinion.

In determining whether Medicare benefits should be granted, courts have stressed a sensible nontechnical approach, which does not simply focus on the services actually provided, but examines every aspect of the claimant's physical condition.

"It was never intended by Congress that the condition of the insured, treatment that might at any time be necessary, and the pain and discomfort attending inadequate or unprofessional care or lack of care not be considered together with treatment actually provided in determining whether extended care services are justified. Every aspect of the plaintiff's physical condition must be considered in making the determination. Treatments immediately required are of course a major factor. However, even if no treatment were required the condition of the insured might be so unstable or unsatisfactory, as to require the extended services contemplated by the statute." Sowell v. Richardson, 319 F.Supp. 689, 692 (D.S.C.1970).

Mindful of the remedial purpose of the social security legislation, the Court concludes that there is no substantial evidence to support the findings of the Secretary, denying Medicare benefits to plaintiff. The record is clear that hospitalization was necessary not only for her injuries to properly mend, but also for observation by skilled medical personnel. Wherefore, defendant Secretary's motion for summary judgment is denied. This case will be remanded to the Secretary for the granting of benefits to cover the period of hospitalization between May 13, 1970 and June 14, 1970.